## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON DIVISION

**CAPITAL ONE BANK (USA), N.A., et al.,**

      Plaintiffs,

v.                              CIVIL ACTION NO. 2:08-cv-00165

**DARRELL V. McGRAW, JR.,**

      Defendant.

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT
## OF MOTION TO MODIFY
## JUNE 26, 2008 ORDER OF THIS COURT

RESPECTFULLY SUBMITTED,
DARRELL V. McGRAW, JR.
in his official capacity as the Attorney General
for the State of West Virginia

By counsel

**FRANCES A. HUGHES**
Frances Hughes Bar Number: 1816
CHIEF DEPUTY ATTORNEY GENERAL
State Capitol Complex
Building 1, Room W-435
Charleston, WV 25305
Telephone:  304-558-2021

**CHARLI FULTON**
Charli Fulton Bar Number: 1314
SENIOR ASSISTANT ATTORNEY GENERAL
Consumer Protection Division
Post Office Box 1789
Charleston, West Virginia 25326-1789
Telephone:     304-558-8986
Facsimile:      304-558-0184

**TROY GIATRAS**
Troy Giatras Bar Number: 5602
SPECIAL ASSISTANT ATTORNEY GENERAL
GIATRAS LAW FIRM
118 Capitol Street, Suite 400
Charleston, WV 25301
Telephone:  304-343-2900

## TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.     Introduction and Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.   Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

IV.    Legal Standard Under Rule 60, F.R.C.P. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

V.     Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

       A.    Applying the original injunction is no longer equitable because of changes in
             the decisional law relied upon by this Court. . . . . . . . . . . . . . . . . . . . . . . . 14

       B.    Applying the original injunction is no longer equitable because of changes in
             statutory law applicable to credit card lending practices. . . . . . . . . . . . . . . . 17

       C.    Applying the original injunction is no longer equitable because there has been
             a significant change to the executive branch's position on preemption. . . . . . . 19

VI.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

# TABLE OF AUTHORITIES

## FEDERAL CASES

Agostini v. Felton,
    521 U.S. 203 (1997) ............................................................................. *passim*

Alexander v. Britt,,
    89 F.3d 194, 198 (4th Cir. 1996) ....................................................... 9

Arizona v. California,
    460 U.S. 605 (1983) ............................................................................. 12

Browder v. Director, Department of Corrections of Ill.,
    434 U.S. 257 (1978) ............................................................................. 13

Capital One Bank v. McGraw,
    563 F. Supp. 2d 613 (S.D.W.Va. 2008) .............................................. *passim*

Clearing House Association v. Cuomo,
    510 F.3d 105 (2d Cir. 2007) ................................................................ 3, 13, 14

Cuomo v. Clearing House Association,
    129 S. Ct. 2710 (2009) ........................................................................ 1, 14, 15, 16

Elgin National Watch Co. v. Barrett,
    213 F.2d 776 (5th Cir. 1954) ............................................................... 3, 10

First Union National Bank v. Burke,
    48 F. Supp. 2d 132 (D. Conn. 1999) ................................................... 3

Harmon v. Pauley,
    678 F.2d 479 (4th Cir. 1982) ............................................................... 13

National City Bank of Indiana v. Turnbaugh,
    463 F.3d 325 (4th Cir. 2006) ............................................................... 3

OCC v. Spitzer,
    396 F. Supp. 2d 382 (S.D.N.Y. 2005) ................................................ 3

O'Sullivan v. Chicago,
    396 F.3d 843 (10th Cir. 2005) ............................................................. 8

Plyler v. Evatt,
    846 F.2d 208, 212 (4th Cir. 1988) .................................................................... 9

Prudential Insurance Co. of America v. National Park Medical Center, Inc.,
    413 F.3d 897 (8th Cir. 2005) ..................................................................... 3, 13

Ridley v. Phillips Petroleum Co.,
    427 F.2d 19 (10th Cir. 1970) ...................................................................... 13

Theriault v. Smith,
    523 F.2d 601 (1st Cir. 1975) ...................................................................... 10

Thompson v. U.S. Department of Housing and Urban Development,
    404 F.3d 821 (4th Cir. 2005) ..................................................................... 8, 9

United States v. Swift & Co.,
    286 U.S. 106 (1932) ............................................................................. 8, 13

Valero Terrestrial Corp. v. Paige,
    211 F.3d 112 (4th Cir. 2000) ............................................................. 9, 10, 12

Wachovia Bank v. Burke,
    414 F.3d 305 (2nd Cir. 2005) ...................................................................... 3

Watters v. Wachovia Bank, N.A.,
    550 U.S. 1 (2007) ............................................................................... 3, 14

Wells Fargo Bank, N.A. v. Boutris,
    419 F.3d 949 (9th Cir. 2005) ....................................................................... 3

## FEDERAL STATUTES

12 C.F.R. § 7.4000 ........................................................................... 1, 3, 15

12 U.S.C. § 484(a) ................................................................................... 3

15 U.S.C. § 1637(n) ............................................................................ 17, 18

15 U.S.C. § 1665d(a) ................................................................................ 18

15 U.S.C. § 1665e ................................................................................... 18

15 U.S.C. § 1666c(b) ................................................................................ 18

15 U.S.C. § 1666i-l(a) .............................................................................. 18

iii

74 F.R. 24693 (May 20, 2009) ................................................................................................ 19

## I.    INTRODUCTION AND SUMMARY

This court previously held,

> Neither party disputes that Capital One is a national bank.  I have found that the defendant's continued attempt to enforce its subpoena constitutes a visitation.  The NBA and federal regulations prohibit state officials from visiting national banks. . . .
>
> In light of the above finding, [Capital One is]  entitled to a declaratory judgment that (1) the [Attorney General] and his agents may not pursue the subpoena issued against Capital One or the petition for enforcement of the subpoena against Capital One, and (2) the defendant and his agents may not investigate or sue Capital One regarding credit card lending.

Capital One Bank v. McGraw, 563 F. Supp. 2d 613, 622 (S.D.W.Va. 2008).  On June 29, 2009, the

United States Supreme Court reversed the precedent on which this court based that holding.

> When . . . a state attorney general brings suit to enforce state law against a national bank, he is not acting in the role of sovereign-as-supervisor, but rather in the role of sovereign-as-law-enforcer.  Such a lawsuit is not an exercise of "visitorial powers" and thus the Comptroller erred by extending the definition of "visitorial powers" to include "prosecuting enforcement actions" in state courts, [12 C.F.R.] § 7.4000.

Cuomo v. The Clearing House Ass'n, 129 S. Ct. 2710, 2721 (U.S. 2009).  In addition, the statutory

law governing credit card lending has changed to prohibit the lending practices at issue, and the

Executive Branch's position on the preemption of state laws has changed.  This court previously

expressed reservations about whether entry of the injunction was equitable but noted that it was

bound by federal law to enter it.  Now that that law has been reversed, prospective application of the

injunction against judicial enforcement actions is no longer equitable – if it ever was – and this court

should grant the requested relief.

## II.     PROCEDURAL BACKGROUND

This case arose from the West Virginia Attorney General's investigation of Capital One Bank (USA), N.A. ("the bank" or "Capital One") and Capital One Services, Inc. ("COSI").[1] In the spring of 2005, the Attorney General issued investigatory subpoenas to the bank and COSI based upon consumer complaints alleging that the bank and/or COSI (1) promised consumers high amounts of credit that they never received; (2) charged consumers high interest rates and high late fees and overlimit fees; (3) refused to allow consumers to close accounts, and (4) sold consumers a product called "The Payment Protection Plan" from which consumers received no benefits.  At the time the subpoenas were issued Capital One was a state bank chartered in Virginia.

Neither the bank nor COSI responded to the Attorney General's subpoenas, and the Attorney General filed suit to enforce the subpoenas on May 9, 2005.  Shortly after the Attorney General filed his enforcement action, the bank applied to become a national bank.  On September 10, 2007 the Attorney General obtained an order requiring the bank and COSI to comply with the subpoenas.  The bank and COSI appealed to the West Virginia Supreme Court.  On March 1, 2008, while that appeal was pending, the bank converted to a national bank.  The bank and COSI immediately filed this action seeking a declaration that the Attorney General may not enforce his subpoenas against them, pursue the state-court action for enforcement of the subpoena, or otherwise investigate or sue them regarding banking activities.  Capital One Bank v. McGraw, 563 F. Supp. 2d 613, 616 (S.D. W.Va. 2008), *citing* Compl. ¶ ¶ 29-31.  *See also*, Compl. Prayer, ¶ A.

The bank and COSI alleged that the Attorney General's issuance of and efforts to enforce

---

[1]The name "Capital One" is a service mark of Capital One Services, Inc.  It is used to refer to the bank herein, however, so as to be consistent with this court's prior use of terminology. *See* Capital One Bank v. McGraw, 563 F. Supp. 2d 613 (S.D.W.Va. 2008).

2

investigatory subpoenas constitute the exercise of "visitorial powers" as that term is defined in

12 U.S.C. § 484(a) and violates the visitorial powers rule found at 12 C.F.R. § 7.4000.  On June 26,

2008, this court entered a Memorandum Opinion and Order holding that the Attorney General's

subpoena could not lawfully be enforced against the bank.  The court permanently enjoined the

Attorney General from (1) issuing subpoenas or demanding the inspection of any books or records

of the bank in connection with his investigation of credit card lending, and (2) enforcing the State's

previously-issued subpoena against the bank.[2]  Capital One Bank v. McGraw, 563 F. Supp. 2d 613

(S.D.W.Va. 2008).  The State did not appeal, based upon the decisional law at that time.[3]  This fact

does not preclude this court from exercising its equitable power to modify its injunction.  Elgin

National Watch Co. v. Barrett, 213 F.2d 776 (5th Cir. 1954); Prudential Ins. Co. of America v. Nat'l

Park Medical Center, Inc., 413 F.3d 897, 905 (8th Cir. 2005).

---

[2]COSI was not an operating subsidiary of the bank when the court issued its memorandum opinion and judgment order, Thus, the court found that COSI's activities were not protected by the National Banking Act and granted the Attorney General's motion to dismiss COSI's claims.  Capital One, 563 F. Supp. 2d at 614.  However, COSI became an operating subsidiary of the bank on December 18, 2008.

[3]See Wachovia Bank v. Burke, 414 F.3d 305, 320 (2nd Cir. 2005) (OCC regulation extending exclusive authority over national banks to banks' subsidiaries reasonable interpretation of National Bank Act); Wachovia Bank v. Burke, 414 F.3d 305, 314 (2nd Cir. 2005) (presumption against federal preemption fails in regard to national banks, a field substantially occupied for extended period of time by OCC); Nat'l City Bank of Indiana v. Turnbaugh, 463 F.3d 325, 332 (4th Cir. 2006) (Goodwin, J.) (OCC extension of regulatory authority to operating subsidiaries of national banks and preempting state laws permitting Commissioner's visitorial powers were reasonable); OCC v. Spitzer, 396 F. Supp. 2d 382, 407-408 (S.D.N.Y. 2005)(OCC visitorial powers rule, § 7.4000, was reasonable interpretation of National Bank Act); First Union National Bank v. Burke, 48 F. Supp. 2d 132, 149 (D. Conn. 1999) (OCC's persuasive authority that it, not the state banking commissioner, was empowered to directly enforce state banking law against national banks demonstrated likelihood of success on merits of its claim that the state commissioner's cease and desist order interferes with OCC's exclusive authority over national banks); Wells Fargo Bank, N.A. v. Boutris, 419 F.3d 949, 962 (9th Cir. 2005) (OCC within its authority in promulgating regulation preempting state laws attempting to regulate operating subsidiaries of national banks) (NBA preempts state visitorial authority over national bank operating subsidiaries).  This court's decision in the instant case was based primarily on the two most recent decisions, Watters v. Wachovia Bank, N.A., 550 U.S. 1 (2007) and Clearing House Ass'n v. Cuomo, 510 F.3d 105 (2d Cir. 2007).

## III.   FACTUAL BACKGROUND

The Attorney General began his investigation into suspected unfair or deceptive acts or practices by the bank and COSI in 2004. Prior to issuing his subpoenas, the Attorney General's office reviewed over 200 consumer complaints. These consumers' complaints contained documents and other information that led the Attorney General to suspect the bank and COSI of unfair or deceptive acts or practices in the conduct of the marketing, sale and servicing of the bank's credit cards. These consumers complained that:

- They received Capital One credit cards with low limits such as $200 or $300 and high "membership" fees such as $59 per year or $6 per month.[4]

- On learning of the low credit limits they were offered and the high fees they would have to pay for this credit, some consumers decided not to activate the credit cards. Without being activated, the credit cards could not be used and Capital One extended no credit to the consumers who received the credit cards. Nonetheless, the bank/COSI imposed "membership fees," late fees, and other types of charges on these never-activated accounts. Consumers who activated their low limits cards were charged the entire "membership" fee on their first monthly statements. As a result, consumers with a $59 fee and a $200 credit limit account would have only $141 of credit available at the time the card was activated. In such a case, the charge incurred for the annual fee used up 41.48% of the available credit for the account.

- The bank/COSI had marketed various additional products and services to consumers when they called to activate their cards. The charges were immediately made to consumers' cards, resulting an even lower amount of available credit. Consumers with these low-limit cards who were charged an annual membership fee and were sold one or more of these additional products often exceeded their credit limits within the first 30 days of receiving the cards. Yet Capital One did not refuse credit charges that would cause consumers to exceed their credit limits.

- Late fees or interest charges that the bank/COSI imposed caused consumers to exceed their credit limits.

---

[4]During subsequent litigation, the bank represented that it had 500,000 accounts in West Virginia.

4

- Capital One issued more than one such low-limit ($200 or 300) credit card to consumers – for example, it issued two $200 credit cards to a consumer rather than increasing the credit limit on the initial $200 card to $400. Consumers with more than one such low-limit account were subject to multiple "membership" fees and risked incurring multiple late fees, multiple overlimit fees, and multiple other fees. Every month, these consumers incurred additional overlimit charges, causing their level of debt to increase each month – even when they continued to make payments every month and made no new charges to the accounts. Consequently, the $200 or $300 of credit Capital One initially purported to extend to them resulted in many of these consumers owing more than $1,000 – a level of debt from which they could never hope to extricate themselves – for the use of only $141 or $241 of actual credit.

- The bank/COSI refused to allow these consumers to close their accounts so long as there were unpaid balances remaining. So long as there were, the bank/COSI continued to assess membership fees and other fees and charges.

- Consumers who exceeded their credit limits and tried to close their accounts were unable to do so because they received a new $25 or $29 overlimit fee every month. They fell deeply into debt. Some consumers became so discouraged with their level of debt that they stopped paying entirely. These consumers then began accruing monthly late fee charges of $25 or $29, causing their debt to increase by $50 or $58 per month plus interest. If the annual "membership" fee came due while there was still a balance, this fee was added as well. The bank/COSI continued to bill these consumers, adding new monthly fees, for as long as eight months or longer after consumers tried to close their accounts. Capital One extended no new credit to these consumers during this time period. Thus, consumers were charged between $25 and $58 per month solely for the privilege of remaining in debt to the bank/COSI.

- They had received pre-approved offers of credit from the bank/COSI for "up to $5,000" or "up to" other specified dollar amounts. The bank/COSI sent such solicitations to consumers with poor credit histories, limited credit histories, or low income. The bank/COSI sent such solicitations to consumers whose poor credit histories, limited credit histories, or low income made it unlikely they would receive credit lines in the amounts specified in the solicitations. Although these consumers believed they would receive up to $5,000 in credit, most received a default credit line of $200 or $300.

- They received direct mail solicitations from the bank/COSI offering a low fixed annual percentage rate ("APR") guaranteed either for the life of the card

5

or for a specified period of time if they opened a Capital One credit card account. These direct mail solicitations were personalized letters addressed to particular consumers and used their names throughout the letter. The solicitations were touted as an "Invitation" with an individual "Reservation Number" and a special "Access Code" so as to make consumers believe they had been singled out to be extended a special deal.

- Consumers received solicitations from the bank/COSI that promised "You'll save with a great low rate, a fixed APR as low as 2.99% on balances you transfer with this Invitation for as long as the balances exist. Plus, you'll enjoy a variable rate currently as low as 2.99% on all purchases and future balance transfers," or that the consumers will receive "a 0% fixed APR until August 2006 on balances transferred with this Invitation" or that "Unlike other issuers who say their rates are fixed - then surprise you with a higher rate whenever they want to - this 2.99% APR is good until May 2007 on all balances transferred with this application."

- They applied for and received these Capital One cards in response to the solicitation and were led to believe that Capital One had issued their credit cards at the low rates specified in the solicitations. Consumers had no reason to doubt the bank/COSI's confirmation of the approval of their credit cards at the lowest solicited rate since Capital One had presumably confirmed their credit worthiness before it sent them the personalized solicitations and/or when consumers contacted the bank/COSI to apply for credit cards in response to the direct mail solicitations. However, when consumers received their first monthly statements from the bank/COSI they discovered that instead of the APR being the promised 0% or 2.99%, it was 9.99%, 20.40% or higher.

- The bank/COSI sold a service called Payment Protection Plan, both during the calls required to activate newly-issued credit cards and at other times. The service is a combination of credit disability insurance and unemployment insurance. Payment Protection Plan purports to pay the consumer's minimum monthly payment if the cardholder becomes involuntarily unemployed or temporarily disabled or the entire "eligible" balance if the cardholder becomes permanently disabled. (The "eligible" balance is an amount up to the total credit limit or $10,000, whichever is less. Thus, a consumer whose $200 line of credit has risen to $1,000 in debt because of overlimit fees would, at best, have $200 paid under the policy.)

- They were charged $.89 per $100 of account balance per month for Payment Protection Plan coverage. Only persons who are gainfully employed are eligible for Payment Protection Plan coverage. At the time the bank/COSI

6

solicited consumers to buy Payment Protection Plan, it failed to inform consumers that persons who were disabled or unemployed were not eligible for Payment Protection Plan. It frequently sold this service to consumers who did not qualify. When such consumers made claims under the policy, the bank/COSI told them they were ineligible and refunded their premium payments. When such consumers made no such claims, the bank/COSI pocketed the money and continued charging them.

The bank/COSI, by procedural manipulations, succeeded in delaying the court decisions in the subpoena enforcement actions long enough to allow the bank to choose a different federal regulator: the bank moved from regulation by the Federal Reserve Board to regulation by the OCC. The legal consequence of this change, under the law at that time, was that this court was bound to enjoin the Attorney General from suing the bank about its credit card practices.

Both the facts and the law have now changed. The law that bound this court to enter its injunction prohibiting the Attorney General from suing the bank has been reversed. The practices that the Attorney General was investigating as unfair or deceptive acts or practices under West Virginia consumer protection law have been prohibited by federal law. The OCC has been directed to seriously reexamine its claims of federal preemption to ensure that they are not encroaching on state sovereignty. In the meantime, however, the consumers who filed the earliest complaints against the bank and COSI have been turned over to debt collection, and the Attorney General has since received nearly 600 additional complaints. Despite these significant changes in fact and law, the people who filed the complaints that originally drew the Attorney General's attention to the bank's and COSI's unfair or deceptive acts or practices have no recourse under the new law and will continue to suffer the same harms. Under these circumstances, it is clearly inequitable for this court to deny assistance to these consumers who have waited for so long and who have been a force for changing the law.

## IV.    LEGAL STANDARD UNDER RULE 60, F.R.C.P.

A court may relieve a party from a final judgment, order or proceeding if "the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable . . . ." Rule 60(b)(5), F.R.C.P.  The most significant portion of Rule 60(b)(5) is the final ground, allowing relief if it is no longer equitable that the judgment should have prospective application. THE LATE CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE, § 2863 (2009).  This provision is based on the historic power of a court of equity to modify a decree in light of changed circumstances.  Id.

Justice Cardozo explained the principle in 1932 in United States v. Swift & Co., 286 U.S. 106 (1932).  A court of equity has power to adapt an injunction "as events may shape the need." Id. at 114.  This is so whether the injunction was entered by consent decree or after litigation.  Id.  Either way, a court has power to revoke or modify its order if it is satisfied that "what it has been doing has been turned through changing circumstances into an instrument of wrong." Id. at 114, 115.  A party seeking such relief must make "a clear showing of grievous wrong evoked by new and unforeseen conditions." Id. at 119.  See also, Thompson v. U.S. Dept. of Housing and Urban Development, 404 F.3d 821 (4th Cir. 2005).

Although courts continue to cite the "grievous wrong" standard of Swift, they apply the standard with flexibility and do grant relief from injunctions under Rule 60(b)(5).  The "grievous wrong" language of Swift "was not intended to take on a talismanic quality, warding off all efforts to modify consent decrees."  O'Sullivan v. Chicago, 396 F.3d 843, 860, (10th Cir. 2005) quoting Rufo v. Inmates of the Suffolk County Jail, 502 U.S. 367, 380 (1992).  Rather, the standard is a "flexible one. Id. at 861, quoting Rufo.  The general teaching of Swift is "merely that harm and

8

continuing need must always be weighed in the balance in deciding whether continued enforcement of any injunctive decree is equitable in the light of specific changed circumstances." Plyler v. Evatt, 846 F.2d 208, 212 (4th Cir. 1988) *quoting* Holiday Inns, Inc. v. Holiday Inn, 645 F.2d 239, 245 (4th Cir.), *cert denied*, 454 U.S. 1053 (1981). The Fourth Circuit recognizes that Swift permits a more flexible approach when a party seeks relief from decrees "directed at events to come" rather than at "fully accrued" rights. Alexander v. Britt, 89 F.3d 194, 198 (4th Cir. 1996) *citing* Nelson v. Collins, 659 F.2d 420, 424 (4th Cir. 1981) (*en banc*) (*quoting* Swift, 286 U.S. at 114).

It is appropriate to grant Rule 60(b)(5) relief from an injunction when the party seeking relief can show "a significant change either in factual conditions or in law." Agostini v. Felton, 521 U.S. 203, 215 (1997) *quoting* Rufo, 502 U.S. at 384. *See also*, Thompson, 404 F.3d at 827; Plyler, 846 F.2d at 211; Alexander, 89 F.3d at 198. A court may recognize subsequent changes in either statutory or decisional law. Agostini, 521 U.S. at 215.

Courts have granted Rule 60(b)(5) relief based on all three types of changes. In Plyler, *supra*, the Fourth Circuit held that an unanticipated increase in prison population was a change in operative facts sufficient to warrant modification of a consent decree that prohibited double-celling of prisoners. Although Swift and its progeny set a strict standard for modification, that standard was inappropriate in the context of institutional reform litigation because "the unique nature and demands of institutional reform litigation necessitate a more flexible approach to modification." Plyler, 846 F.2d at 212. The court concluded that the district court clearly erred in assessing the degree of potential harm to inmates as contrasted to the risks to the public and abused its discretion in denying the State's request for modification. Id.

In Valero Terrestrial Corp. v. Paige, 211 F.3d 112 (4th Cir. 2000), the Fourth Circuit held

9

relief under Rule 60(b)(5) to be appropriate based on a change in legislation.  In <u>Valero</u>, the district court enjoined West Virginia state agencies from enforcing a state statute found to have constitutional flaws.  <u>Id.</u> at 115.  After the injunction was issued, the West Virginia legislature completely amended the statute so as to eliminate the provisions the district court had found to violate the Commerce Clause.  <u>Id.</u> at 116.  The state defendants then sought dismissal of the case, alleging that the case and the injunctive provisions were moot. <u>Id.</u> at 115.  The district court treated the motion as one brought under Rule 60(b)(5) or (6).  <u>Id.</u> at 115, n.1; <u>Id.</u> at 122, n.5.  The court vacated most of the injunction but left intact the provisions that enjoined enforcement of certain local referenda procedures.  <u>Id.</u> at 115.  The Fourth Circuit  affirmed the district court's grant of relief as to the changed statutory provisions, holding that modification or vacatur of an injunction is required when there has been "a significant change either in factual conditions or in law." <u>Id.</u> at 122, *quoting* <u>Agostini</u>, 521 U.S. 203.[5]

Courts have vacated injunctions based on changes in decisional law both before and after <u>Agostini</u>.  *See*, <u>Theriault v. Smith</u>, 523 F.2d 601 (1st Cir. 1975) (unreasonable to bind defendant to consent decree based on interpretation of law rendered incorrect by subsequent Supreme Court decision); <u>Elgin National Watch Co. v. Barrett</u>, 213 F.2d 776 (5th Cir. 1954) (Rule 60(b)(5) empowers the court to relieve a party from a final judgment when prospective application is no longer equitable).

In 1997, the United States Supreme Court revisited the issue of Rule 60(b)(5) relief in <u>Agostini v. Felton</u>, 521 U.S 203 (1997).  At issue was a 12-year-old injunction that barred New York

---

[5]The court vacated the remainder of the injunction because the companies lacked standing to challenge statutes requiring local referenda.  <u>Valero</u>, 211 F.3d at 122.

City from sending public school teachers into parochial schools to provide remedial education to poor children because such services violated the Establishment Clause of the First Amendment. Id. at 207, *citing* Aguilar v. Felton, 105 S. Ct. 3232 (1985). In Agostini, a group of parents petitioned for relief from the injunction under Rule 60(b)(5). Id. at 214. The parents contended that (1) the injunction was no longer binding because five Supreme Court justices had noted in other cases that they believed the case on which Aguilar rested should be reconsidered or overruled; and (2) the Court's more recently decided Establishment Clause cases had undermined the assumptions on which Aguilar rested. Id. at 215-216. The district court denied relief because Aguilar had not yet been overruled, and the Second Circuit affirmed for substantially the same reason. Id. at 214. The Supreme Court held that the statements by five justices did not, by themselves, furnish a basis for concluding that the Court's Establishment Clause jurisprudence had changed. Id. at 217. Instead, the Court based its Rule 60(b)(5) decision on whether recent Establishment Clause cases had so undermined Aguilar that it was no longer good law. Id. at 217, 218.

The Court began its analysis by noting that it is appropriate to grant a Rule 60(b)(5) motion when the party seeking relief from an injunction can show "a significant change either in factual conditions or in law." Id. at 215, *quoting* Rufo, 502 U.S. at 384. A court may recognize subsequent changes either in statutory or decisional law. Agostini, 521 U.S. at 215, *citing* Railway Employees v. Wright, 364 U.S. 642, 652-653 (1961).

> A court errs when it refuses to modify an injunction in light of such changes. . . . . "[T]he court cannot be required to disregard significant changes in law or facts if it is satisfied that what it has been doing has been turned through changed circumstances into an instrument of wrong."

Id., *quoting* Wright, 364 U.S. at 647. The Court then analyzed its recent Establishment Clause cases

11

and concluded that the assumptions on which Aguilar rested had been undermined. Agostini, 521
U.S. at 222-230. The Court noted that lower courts should not conclude that the Supreme Court has,
by implication, overruled an earlier precedent. Id. at 237 Instead, the lower court is to apply the
precedent that has direct application to the case and leave it to the Supreme Court to overrule its own
decisions. Id. Thus, the courts below correctly recognized that the motion had to be denied unless
and until the Supreme Court reinterpreted the binding precedent. Id. at 238. Nonetheless, the
Supreme Court reversed the Second Circuit and remanded the case with instructions to vacate the
injunction. Id. at 2019. Two of the dissenting justices urged the adoption of a different analysis
because the Court was reviewing the Rule 60(b)(5) motion for abuse of discretion. Id. at 238. The
majority opinion rejected this, stating, "It is true that the trial court has discretion, but the exercise
of discretion cannot be permitted to stand if we find it rests upon a legal principle that can no longer
be sustained." Id. The doctrine of *stare decisis* does not preclude the Court from overruling a
previous decision where there has been a significant change in or subsequent development of the
law. Id. at 235. "*Stare decisis* may yield where a prior decision's 'underpinnings [have been]
eroded, by subsequent decisions of this Court.'" Id. at 236, *quoting* United States v. Gaudin, 515
U.S. 506, 521 (1995). Nor does the "law of the case" doctrine place any additional restraints on the
Court's ability to overrule Aguilar. Id. at 236. The doctrine does not apply if the court is "convinced
that [its prior decision] is clearly erroneous and would work a manifest injustice." Id., *quoting*
Arizona v. California, 460 U.S. 605, 618, n. 8 (1983).

Thus, after Agostini, a court is required to modify or vacate an injunctive order when
significant changes make it no longer equitable for the judgement to have prospective application.
Valero Terrestrial Corp. v. Paige, 211 F.3d at 122. A moving party's failure to petition for certiorari

12

does not preclude the granting of relief under Rule 60(b)(5).

> In this case, not only was there substantial subsequent change in law but also the movants' original decision not to file a write of certiorari was reasonable because the Supreme Court had recently declined to consider similar issue in two cases . . . . This reasonably perceived futility of seeking a write of certiorari does not foreclose the district court from granting the movants' subsequent Rule 60(b)(5) motion where, as here, a subsequent Supreme Court decision clearly undermines the propriety of ongoing relief.

Prudential Ins. Co. of America v. Nat'l Park Medical Center, Inc., 413 F.3d 897, 905 (8th Cir. 2005). The one-year limitation applicable to some Rule 60 grounds for relief does not apply to Rule 60(b)(5). Ridley v. Phillips Petroleum Co., 427 F.2d 19 (10th Cir. 1970).[6]  A motion for relief from an injunction under Rule 60(b)(5) is to be addressed by the court that entered the injunction. THE LATE CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE, § 2863 (2009).  The decision on the motion is in the court's discretion and is reviewed for abuse of discretion. Browder v. Director, Dept. of Corrections of Ill., 434 U.S. 257, n.7 (1978).

## V.    ARGUMENT

This Court should modify the injunction as requested because applying the original injunction prospectively is no longer equitable.  Under Swift, a court may modify or dissolve an injunction when a party to the injunction makes a clear showing of "grievous wrong."  Swift, 286 U.S. 106, 119.  Under Agostini, a court errs when it refuses to modify an injunction in the face of "significant changes in factual conditions or in law."  Agostini, 521 U.S. at 215.  The Attorney General's request for relief under Rule 60(b)(5) should be granted regardless of which standard is applied.

---

[6] Nor does it apply to relief under Rule 60(b)(6).  Harmon v. Pauley, 678 F.2d 479 (4th Cir. 1982).

13

A.      **Applying the original injunction is no longer equitable because of changes in the decisional law relied upon by this Court.**

This court's ruling enjoining the Attorney General from suing Capital One Bank rests on two legal precedents – <u>Watters v. Wachovia Bank, N.A.</u>, 550 U.S. 1 (2007) and <u>Clearing House Ass'n v. Cuomo</u>, 510 F.3d 105 (2d Cir. 2007) – the first of which has now been clarified to mean something other than what this court understood, the second of which has been overturned. <u>Cuomo v. Clearing House Ass'n</u>, 129 S. Ct. 2710 (2009).

This court read the Supreme Court's statements in <u>Watters</u> to imply that investigation and enforcement of state laws against national banks were just as much aspects of visitorial power as were the state registration requirements that were at issue in <u>Watters</u>. <u>Capital One</u>, 563 F. Supp. 2d at 618, *citing* <u>Clearing House Ass'n</u>, 510 F.3d at 116. In <u>Cuomo</u> ,the United States Supreme Court concluded that investigation was included in visitorial power but judicial enforcement actions were not. The Court wrote that <u>Watters</u> was fully in accord with the distinction between supervision and enforcement. <u>Cuomo</u>, 129 S. Ct. at 2717. The Court described "general supervision and control" and "oversight" as being "worlds apart from law enforcement." <u>Id.</u> Thus, this court's interpretation of <u>Watters</u> as applied to judicial enforcement actions by substantive litigation is no longer good law.

The remainder of this court's ruling rested on the Second Circuit opinion in <u>Clearing House Ass'n</u>. <u>Capital One</u>, 563 F. Supp. 2d at 618-620. In <u>Clearing House Ass'n</u>, the New York Attorney General argued that his investigatorial activities fell within the § 484(a) exception for visitorial powers "vested in the courts of justice." <u>Clearing House Ass'n</u>, 510 F.3d at 118. The Second Circuit rejected this argument and affirmed the district court's injunction. The Second Circuit's ruling rested on <u>Chevron</u> analysis. Under the first step, the court found that the text of § 484(a) did

14

not clearly preclude the OCC's interpretation. Id. at 117. Under the second step, the court concluded that the OCC's interpretation of the statute was based upon a permissible construction of the statute. Id. at 120.

This court noted that the West Virginia Attorney General did not argue that his activities were covered by the "vested in the courts of justice" exception; however, the court stated that this argument would likely have been unsuccessful, as it was in Clearing House Ass'n. Capital One, 563 F. Supp. 2d at 621, n.3. Relying on Clearing House Ass'n, the court then applied Chevron analysis, concluding that there is little difference between what the New York Attorney General was doing in Clearing House Ass'n and what the West Virginia Attorney General is doing in this case. Capital One, 563 F. Supp. 2d at 619.  In both cases a state attorney general was investigating a national bank's exercise of its federal powers – the New York Attorney General investigating real estate lending, the West Virginia Attorney General investigating credit card lending.  Id. at 619-620. However, the West Virginia Attorney General had gone farther than the New York Attorney General by actually issuing subpoenas, instead of just threatening to do so.  Id. at 620.  Thus, this court concluded, Clearing House Ass'n supports this court's determination that the West Virginia Attorney General  was exercising visitorial powers by issuing a subpoena to Capital One Bank.

On January 16, 2009, the United States Supreme Court granted *cert.* in Clearing House Ass'n, and on June 29, 2009, the Court handed down its decision.  Cuomo v. Clearing House Ass'n, 129 S. Ct. 2710 (2009) (hereafter "Cuomo").  The Court held that the OCC's visitorial powers rule, 12 C.F.R. § 7.4000, which purports to prohibit state law enforcement of non-preempted state laws, is not a reasonable interpretation of the National Bank Act.  Cuomo, 129 S. Ct. at 2714. Accordingly, the Court affirmed the injunction as applied to the threatened issuance of subpoenas

by the New York Attorney General but vacated it insofar as it prohibits the Attorney General from bringing judicial enforcement actions. Cuomo, 129 S. Ct. at 2722. Applying Chevron analysis, the Court conceded that there is some ambiguity as to the meaning of the statutory term "visitorial powers." Cuomo, 129 S. Ct. at 2714. The Comptroller is authorized to give authoritative meaning to the statute within the bounds of that uncertainty. Cuomo, 129 S. Ct. at 2714. However, the existence of some uncertainty does not expand Chevron deference to cover "virtually any interpretation of the National Bank Act." Cuomo, 129 S. Ct. at 2714. The Court can discern the outer limits of the term "visitorial powers," and those limits do not include ordinary enforcement of the law. Cuomo, 129 S. Ct. at 2714.

The Supreme Court's conclusion that the OCC's regulation is not a reasonable interpretation of the statute, under Chevron, is based on (1) evidence from the time of the statute's enactment,[7] (2) a long line of Supreme Court cases,[8] and (3) the application of normal principles of statutory construction to the National Bank Act.[9] Cuomo, 129 S. Ct. at 2714. In applying the principles of statutory construction to the National Bank Act, the Court concludes that the § 484(a) reservation of state powers "vested in the courts of justice" is "explicable only as an attempt to make clear that the courts' ordinary powers of enforcing the law are not affected" by the National Bank Act. Cuomo, 129 S. Ct. at 2718. Thus, the Supreme Court reversed not only the caselaw precedent upon which this Court's injunction rested but also each legal theory cited in that precedent.

---

[7] The discussion of historical evidence is found at § I.A. of the opinion. Cuomo, 129 S. Ct. at 2715-2716.

[8] The discussion of cases is found at § I.B. of the opinion. Cuomo, 129 S. Ct. at 2716-2717.

[9] The discussion of statutory construction is found at § I.C of the opinion. Cuomo, 129 S. Ct. at 2717.

**B.      Applying the original injunction is no longer equitable because of changes in statutory law applicable to credit card lending practices.**

In the past several years Congress has held a series of hearings on consumer credit issues, addressing many of the same issues that West Virginia consumers raised – and continue to raise – in their complaints against the bank and COSI.   In the spring of 2008, the Federal Reserve Board promulgated Regulation AA, a rule which, for the first time, placed restrictions on credit card lenders' ability to raise interest rates on consumer credit card accounts unilaterally and at will. Regulation AA's effective date is set for July 1, 2010.  By January 2009, it became apparent that Congress was likely to pass credit card reform legislation that made such restrictions applicable to all credit card lenders, not just those subject to the regulatory authority of the Federal Reserve Board. On May 22, 2009, Congress enacted the Credit Card Accountability Responsibility and Disclosure Act of 2009 (the Credit CARD Act).   The Credit CARD Act, which  amends the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*, outlaws many of the abuses that have been the subject of consumers' complaints filed with the Attorney General for the past several years.

For example, the new law establishes standards applicable to the issuance of subprime or "fee harvester" cards, providing that accounts requiring the payment of any fees by the consumer in the first year that exceed 25 percent of the credit limit may not count those fees against the amount of credit available to the consumer.  15 U.S.C. § 1637(n).   It places new restrictions on the imposition of over-limit fees that require consumers to affirmatively opt-in to being allowed over-limit purchases.  15 U.S.C. § 1637(k)(1), -(2).  Moreover, it requires late fees and over-limit fees to be reasonable and proportional and requires the lender to conspicuously disclose in every statement the date after which such fees will be imposed and the amount of the fees.   15 U.S.C. § 1665d(a);

17

15 U.S.C. § 1637(b)(12).

The Act requires that all payments in excess of the minimum payment be applied first to the balance with the highest interest rate, then to each successive balance with the next highest rate of interest, 15 U.S.C. § 1666c(b), and prohibits universal default clauses and retroactive increases on pre-existing balances,  15 U.S.C. § 1666i-l(a).  The Federal Reserve Board has been directed to promulgate regulations to "prevent unfair or deceptive acts or practices in connection with the manipulation of credit limits designed to increase over-the-limit fees or other penalty fees. "  15 U.S.C. § 1637(k).  The law further restricts the use of the term "fixed rate," which may be used only if the interest rate "will not change or vary for any reason over the period specified clearly and conspicuously in the terms of the account,"  15 U.S.C.  § 1637(m), and prohibits creditors from issuing any open-end credit account or raising the credit limit on an existing account unless the creditor considers the consumer's ability to make the payments under the terms of the account.  15 U.S.C. § 1665e.

After the adoption of Regulation AA, but before the enactment of the Credit CARD Act, the Consumer Protection Division began receiving telephone calls from consumers complaining that the interest rates on their credit cards had been abruptly increased without explanation, although the consumers had never paid late on their accounts or otherwise become higher credit risks.  The Division also received new consumer complaints from Capital One Bank cardholders enclosing written notices of such interest rate increases.  Credit card lenders – including Capital One Bank – were preemptively raising consumers' interest rates so as to beat the deadline after which such changes could no longer be made unilaterally and at will.  Because the effective date of most provisions of the Credit CARD Act is February, 2010, lenders still have six months remaining to

raise interest rates at will.  It is clear that the enactment of these new protections do not remedy the situations of the consumers whose complaints prompted the Attorney General's actions.  Thus, failure to modify the injunction will result in continuing harm to these consumers, who have no recourse under the new law.

C.      **Applying the original injunction is no longer equitable because there has been a significant factual change to the executive branch's position on preemption.**

Not only has the decisional law on which this court's decision rested changed, but there have also been significant changes in operative facts.  On May 20, 2009, President Barack Obama issued a memorandum directed to the heads of all executive departments and agencies.  Memorandum, 74 F.R. 24693 (May 20, 2009).  The President noted that in recent years  executive departments and agencies have sometimes announced that their regulations preempt State law "without explicit preemption by the Congress or an otherwise sufficient basis under applicable legal principles." Accordingly, the purpose of the memorandum was to state the general policy of the Administration that "preemption of State law by executive departments and agencies should be undertaken only with full consideration of the legitimate prerogatives of the States and with a sufficient legal basis for preemption." Memorandum, 74 F.R. 24693 (May 20, 2009).  By setting these standards, President Obama is establishing his clear intent to change practices in the executive branch of government so as to avoid eroding state sovereignty and raising difficult issues of federalism.

VI.     **CONCLUSION**

At the time of this court's decision, the injunction against suing the bank was equitable, if at all, only because federal decisional law demanded this result.  Now that the federal law that demanded that result has been reversed, it is no longer equitable – under any theory – for this court's

19

injunction against suing the Bank to have prospective application.   Consequently, this court is

required to modify the injunction to dissolve that provision.  Valero, *supra*.

RESPECTFULLY SUBMITTED,

DARRELL V. McGRAW, JR.,
in his official capacity as the
Attorney General of the State of West Virginia
Defendant

By Counsel

**s/ FRANCES A. HUGHES**
Frances Hughes Bar Number: 1816
CHIEF DEPUTY ATTORNEY GENERAL
State Capitol Complex
Building 1, Room W-435
Charleston, WV  25305
Telephone:  304-558-2021

**s/CHARLI FULTON**
Charli Fulton Bar Number: 1314
SENIOR ASSISTANT ATTORNEY GENERAL
Consumer Protection Division
Post Office Box 1789
Charleston, West Virginia  25326-1789
Telephone:     304-558-8986
Facsimile:      304-558-0184
E-mail:  ccf@wvago.gov

**s/ TROY GIATRAS**
Troy Giatras Bar Number: 5602
SPECIAL ASSISTANT ATTORNEY GENERAL
GIATRAS LAW FIRM
118 Capitol Street, Suite 400
Charleston, WV  25301
Telephone:  304-343-2900

20

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### CHARLESTON DIVISION

**CAPITAL ONE BANK (USA), N.A., et al.,**

        Plaintiffs,

v.                                  CIVIL ACTION NO. 2:08-cv-00165

**DARRELL V. McGRAW, JR.,**

        Defendant.

## CERTIFICATE OF SERVICE

    I, Charli Fulton, Sr. Assistant Attorney General, Consumer Protection/Antitrust Division, do hereby certify that a true and accurate copy of the foregoing **DEFENDANT'S MOTION TO MODIFY JUNE 26, 2008 ORDER OF THIS COURT** and **DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO MODIFY JUNE 26, 2008 ORDER OF THIS COURT**, was electronically filed with the Clerk of the court on this 19th day of August, 2009 using the CM/ECF system, which will send notification of such filing to the CM/ECF participants:

Niall A. Paul, WV Bar No. 5622
Bruce M. Jacobs, WV Bar No. 6333
Spilman Thomas & Battle, PLLC
300 Kanawha Boulevard, East
Charleston, WV 25301


**s/CHARLI FULTON**
Charli Fulton Bar Number: 1314
*Counsel for Defendant, Darrell V. McGraw, Jr. as*
   *Attorney General of the State of West Virginia*
Senior Assistant Attorney General
Office of the Attorney General
Consumer Protection /Antitrust Division
Post Office Box 1789
Charleston, West Virginia 25326-1789
Telephone:    304-558-8986
Facsimile:    304-558-0184
E-mail: ccf@wvago.gov